212-154 Lewis-Gimenez v. BMI Reliant Waste Counsel, you may proceed. Your Honors, it may please the Court. Counsel, my name is Mr. Christopher Tomczyk representing Mr. Lewis-Gimenez in this manner. I will be presenting comments regarding how we feel the decision of the Industrial Commission about the permanency should be reversed and if time allows, the decision of the maintenance credit that was given to respondent also should be reversed. In looking at the decision of the Illinois Workers' Compensation Commission, they say, and I quote, Petitioners in those skills were not limited to such an extent as to qualify him as an odd lot permanent total finding. While his English capability, his medical condition, his education are factors to be looked at to consider whether he can return to work, there's no case law out there saying that if you can speak English well, we're not going to find you as an odd lot permanent total disability. They did look at his job search that he did perform, which we maintain was adequate, which the arbitrator maintained was established under the established Illinois law. The Commission didn't say, well, based upon this, we find it is inadequate. They didn't say, based upon his medical restrictions and his job search and his English capability, we feel it is inadequate. They said, we feel that his English skills are not limited to such an extent to qualify him as an odd lot permanent total. We feel, Your Honor, that is contrary to all the established case law that is out there. We cite the standard about supplying job logs for an odd lot finding as one way to find that he's entitled to an odd lot category, and then the respondent will be entitled to rebut that presumption. Again, under the law, it doesn't say that if he speaks English, he's not entitled to a finding. On top of that, we feel just as a matter of the evidence that is presented, also considering the Commission's decision that it should be reversed as a manifest weight of the evidence. We've got job logs showing over 80 employers were contacted in person by this gentleman. He didn't sit at home on the Internet and call up 20 jobs in five minutes and say he did a job search. He went to all these employers in person, that is unrebutted. He's got less than a high school education, no formal GED. All he's been is a laborer his entire life. This is the type of job search he knows. This is the type of job search he's familiar with.  The arbitrary found that this established a diligent job search, and then we have to look at two respondents' rebuttal evidence, which are two labor market surveys. The first one lists 11 jobs that they say he could qualify for. Well, if you look at it, he only qualifies for one, the one in the food service industry. Every other job listed needs a GED or other light assembly or mechanical experience, stuff that Mr. Jimenez just doesn't have. So we have one job out of 11 that he could possibly perform in the current economy. He looked at 26 different employers for that type of job. Again, we feel the arbitrator's determination was correct, that a prima facie finding was shown of a diligent job search, and that respondent, by not providing any vocational assistance, by providing two what we would feel would be inadequate labor market surveys, show that Mr. Jimenez did satisfy his burden that he is an odd lot permanent total claimant. What about the argument that the commission improperly denied your client maintenance benefits? In that argument, Your Honor, I believe if you look at the Roper case, the holding on Roper basically states that, in that case, Roper argued that when you read Section 8A and Section 7110.10A together, there would be a burden on the employee to request vocational rehabilitation, and that that must be requested before any type of benefits could be given. The decision states that, quote, moreover, when read together, Section 8A and Rule 7110.10A only tend to support a finding contrary to Roper's assertion. It basically means that it is not petitioner's burden to request vocational rehabilitation. It is respondent's burden to initiate vocational rehabilitation. If it's their duty to initiate vocational rehab, it's also their duty then to pay appropriate maintenance benefits. But what triggers the employer's obligation? Doesn't it have to be some rehabilitation program going on? I mean, what are they paying the maintenance benefits for, then, if there's no rehabilitation efforts ongoing? Well, in the instant matter, Your Honor, in July of 2009, as evidenced by the record, our office specifically requested vocational rehabilitation commence. They did nothing other than do a labor market survey that we got just before trial. There was no active part on respondent's, excuse me, there's no active role on respondent's side in this case to help the petitioner once he reached MMI, and it was indicated that they had no job for him. They claimed that he was a probationary employee, and at that point, he wouldn't have a job to go back to. However, he was an employee when he was injured. He reached MMI. He could not return to his former employment. He has limited restrictions of up to 20 pounds, which was validated by an FCE and his treater, and they provided nothing. We believe the credit that was taken by the industrial commission was against their own. What about this argument, Dr. Matz testified claimant was able to lift up to 50 pounds, which would have enabled him to perform the same job he was formerly employed, performing for the employer without any special accommodations. And the labor market surveys concluded there were a number of jobs available within the claimant's restrictions, and the claimant did not establish that these jobs paid less than his former job with the employer. So aren't those considerations that enter into the decision? Well, as far as Dr. Matz's opinion, the original arbitrator found that Dr. Matz's credibility was less than that of petitioners treating physician, and that part of that decision I believe was affirmed by the commission. As I said, all other matters were affirmed. As far as what that second labor market survey that was based upon Dr. Matz's other opinions, again, that was based on a medical limitation far above what his treating physician and a valid FCE had placed him at. At that point, the arbitrator felt that there was no validity to that secondary job site, which she also does not comment on in her original decision. Well, you made a good argument. Hey, you know, there's no they're not offering the bulk rehab, okay, so there's a problem there, but doesn't it tie into whether or not they're required to offer? Claimant didn't say he lacked the skills to obtain employment without the bulk rehab. He testified that he felt he was able to perform all the jobs about which he inquired about during his job search. So what would be the point of bulk rehab then? To assist this person for obtaining that job. You have a gentleman who has very limited education, who has been a laborer all his life, now looking for work in a market that has 10 percent unemployment, and he's on his own trying to do this with no help, and we've shown that it wasn't successful. On the respondent's side, that secondary job report that says, hey, look, we think you can do this type of work, was done in December of 2009. They didn't help him in April, May, June, July, August, September, October. They didn't help this guy out. They didn't say, oh, hey, look, try looking at some of these programs. Hey, look, maybe we have another type of light duty program for you as a different probationary employee. They did nothing. And as far as the reading of Roper, they have an affirmative duty to at least start this. And they didn't start it. Our client tried to finish it, tried to finish it on his own, And quite honestly, for a guy basically the equivalency of a junior in high school, going to 80 employers in eight weeks, I believe is phenomenal. I mean, I know, I doubt anyone here in high school could accomplish such a great job search at that point in time with the ability we have. We sometimes forget, with the amount of good education that we have, that we know how to write a resume. We know going through vocational counselors. We've had people help us on how do we look to find a job that best supports us. This gentleman with an education in Mexico, just coming here and finding jobs on his own, doesn't have a benefit of that type of education. He goes out, looks at his own community, and says, hey, look, can you hire me? If vocational rehabilitation would have been provided, even when asked, we would not even be here on this issue. He could have found a job when he was making time for his injury, and we would just have a permanency hire thing. That didn't happen, so that's why we're here. Just in conclusion, so I can make reference to it, should the decision of the commission be reversed, we ask that you review arbitrator Kinneman's denial of benefits, denial of penalties, as she says in her own brief, the delay in payment of those two years of the benefits that were paid were substantial. It would be two years to pay the active benefits that were approved from 2007 to 2008. Case law says if delayed 14 days creates a reliable presumption, that presumption has never been responded to by a respondent. We feel if the decision is reversed, that penalties would be appropriate. I thank you very much for your time this morning. Thank you, counsel. You may respond. Thank you. Please, the Court. Mr. Tomczyk, John Makarowski on behalf of APALE. What we have here is a question of fact on all issues as to maintenance, TTD, and the permanency. And I would point out that the commission decision was a unanimous decision of all three panel members. And its decision is certainly supported by the evidence, and this Court should not substitute its judgment and change the decision in any way. The employee completed his application for employment in English. And the reason why the commission noted that in its decision is at the time of arbitration, petitioner testified he needed an interpreter to testify. Yet the evidence showed that he also completed the history forms at the doctors and at various hospitals responding to questions in English and writing English. So they attempted to paint a picture of a person with limited educational skills and training as part of their argument, which the commission rejected. His past experience in the workforce consisted at working at restaurants, bakeries, forklift driver, delivery driver. He had a valid driver's license, a Class C license. Now, after the date of accident in this case, he underwent a surgery. Benefits were paid. He underwent a fusion February 16, 2006, by Dr. Bernstein. November 15 of 06, he underwent a functional capacity evaluation. And that functional capacity evaluation revealed seven out of seven positive Waddell findings, indicating he was not giving his best effort. And from a physiological standpoint, his heart rate was only 89, and it should have been much more substantially elevated if he was giving a competitive test performance. It indicated, based upon what he demonstrated, which was, again, a minimum and not a maximum, his at least gave you both sedentary type work. He went back to his treating doctor, Dr. Bernstein, who did the surgery. November 27 of 06, he says, I have no explanation for your continued complaints. He sees him again January 11 of 07. His own doctor proclaims him to be at max medical improvement and capable of work at the level he demonstrated. Now, admittedly, and what the commission could reasonably rely upon, is if an individual has a work release, initially it is their burden to establish that they went out and looked for work and no work is available. However, his employment status no longer existed with the employer because he was a probationary employer and long ago terminated. Admittedly, he made no effort to go out and look for work. We actually had this case settled May 27, and that's in the record, on page 769 with a former counsel. Two months later, Mr. Tomczyk entered the case and indicated that the settlement that was agreed upon was rejected. There was still no indication that the man had looked for work. We went before the arbitrator. She said, well, you need to prove your case. You have no evidence. You're not obligated to pay. He subsequently, 13 months later after this occurs, now goes back to Dr. Bernstein for the first time on February 4 of 08, and Bernstein says, well, I really don't know why he's having these complaints. Let's do a CAT scan. It showed a pseudoarthrosis. They said that could cause some pain. He had additional surgery. We paid benefits again when he was no longer placed at MMI. Treats with Bernstein, he has a second FCE, April 6 of 09. Now his heart rate is 110, a little bit better, but he's still not giving max effort, and it indicates he could work lifting up to 20 pounds. His prior job required lifting up to 30 pounds. Bernstein again places him at max medical improvement. Again, admittedly, he does not look for work to prove that no such work is available to shift the burden to us. We retain a voc expert, July 6 of 09. That voc expert, as the commission notes, had the restrictions of the FCE and Dr. Bernstein and opined based upon this person's education experience, even assuming these restrictions, there exist all these type of jobs that he is capable of doing. Bernstein says, I have no explanation. He's discharged from care. Dr. Matz, as Justice pointed out, did opine that he would be capable of lifting 50 pounds, which would have qualified him for his past job. Yet he makes no effort to go look for work, never brings us any note of any job search. When am I given a job search? The day prior to trial, which was in January of 2010, counsel produces a job search. And that job search did not start for November 16 of 09. And admittedly, Petitioner admits he just showed up at random places of employment. And what counsel doesn't realize, his own claimant's testimony made my case because he testified that he felt he was physically capable of working in all these positions that he applied for, baker, forklift driver, driver, and simply none of the employers were hiring. It would be no different than if a carpenter who had no restrictions went for work and showed up at a plant. Did he have any work? No. He admitted that no employer denied him work due to any restriction. And to find the permanent total, the case law indicates if the employee is capable and qualified to do work without seriously endangering his health, then he's not a permanent total. And that's, in fact, his own testimony. He felt he could do all these jobs. It was just a matter of the economy. They offered no VOC report to indicate the man was not employable. The only VOC evidence is from our expert to labor market surveys that indicated it was. The commission was free to make the decision that they did. It's supported by the evidence. I believe that the permanency award was too high. I think it should have been more in the area of 30 of a man. But that, again, is within the discretion of the commission. They found it 45. I would submit that the decision is well-reasoned and should be affirmed in its entirety. Thank you. Thank you, counsel. Reply? Just two things, Your Honor. Again, we're not asking this panel to submit their... We'll submit something, I think. Yes, I hope you submit something to substitute your judgment for that of the commission. I'm asking you to look at the way the commission's decision was written. And it does say his English skills were not limited to such an extent to qualify him for an odd-lot firm total. In the litany of cases that are presented by a respondent, there's nothing in there that says you have to show that someone isn't capable of speaking good English to be entitled to an odd-lot finding. To address the other point, yes, my client says he felt capable of working in all those jobs that he looked for. A claimant should be able to feel they can work in the jobs that they look for for an odd-lot finding, whether they look for 80 jobs, 100 jobs, 20 jobs, or whatever. If they're applying for that job, they should be able to feel that they can apply for it. And case law holds. Yes, we have an area that we can say, look, you may be able to do something, but there's not an economy out there for you at this point in time to get a job. That's what the odd-lot category is all about. And to do that, you have to supply evidence of a diligent job search. Any case that has ever been decided, I bet you every single one of those claimants felt they could do the jobs they were looking for. But after they presented prima facie evidence that they did the job search that weren't rebutted, they got their firm total award. We feel Mr. Jimenez should get the same, and I thank you again very much for your time this morning. Thank you, counsel. It's a matter to be taken under advisement for a dispositional issue. The court shall stand at recess until 9 o'clock tomorrow morning.